[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff and the defendant, whose birth name was Kniffin, were married on December 15, 1990, in Simsbury, Connecticut. There are three (3) minor children, issue of the marriage. No child has been born who is not issue of this marriage, and the wife is not currently pregnant. The parties have lived in Connecticut for the term of this marriage, and have not been recipients of any form of public assistance. The jurisdictional requirements have been met, and the parties have agreed that the marriage has irretrievably broken down. The court enters its decree dissolving the marriage.
The plaintiff was divorced, with three adolescent children, at the time the parties met in 1987. He was employed with a family-owned business, as is the case at the time of trial. Defendant worked briefly for his company, moved to another job, and they met again at an AA meeting in 1989. He described himself as a recovering alcoholic, and defendant as a recovering drug addict. He is a high school graduate with some courses in computer training and other business issues. The defendant has her graduate equivalency diploma. They married, after the parties entered into a prenuptial agreement. That agreement is Plaintiff's Exhibit 1. The defendant has claimed that the prenuptial agreement is not enforceable. Plaintiff relies on their contract for the disposition of the financial issues of their marriage.
The plaintiff claimed that the defendant yelled at his children from his first marriage, labeled food so that the children would not use it, that she napped every day, and that after the birth of their first child, she slept near the children, upstairs, CT Page 7085 and not in the marital bed, except for rare occasions when they were intimate. He testified that she would leave thereafter, and return to the upstairs. He agreed that they had been trying to get pregnant even before the marriage and they were successful during their second longer honeymoon in Maui. The company paid for their trip. Their first child was born on October 30, 1991. Their second and third children were born in April of 1993 and June of 1995, respectively.
The plaintiff testified that they argued, and during the holidays of 1994-95, those arguments were very heated and constant. He claimed his brother offered his place in Florida so that he could get some relief. He testified that the Sunday before his planned departure, the defendant demanded that he not leave and he refused. He left the family home on February 26, 1995, during a screaming match, where he described that he never felt more like hitting someone. The screaming match was done within hearing of the children, and while the defendant was five months pregnant with their third child. He traveled to Florida, and visited a woman who was from Connecticut. He testified that he called this woman, Charity Folk, when he got to Florida, and that she agreed to have him visit. At that visit, he asked her to go to another location in Florida with him, to which she agreed "on a lark." On that "lark", they had sexual intercourse, and she has since moved in with him. He categorically denied infidelity prior to his move from the marital home, which the court does not find credible. Of some interest is the fact that Ms. Folk left her husband at approximately the same time that the plaintiff took leave of the defendant. He claimed that he was thrown out of the house, but the court does not agree with that characterization.
Upon his return to Connecticut, he could only find the time to see his children ten days later. He testified that he saw the children when the defendant would come to the office with mail or bills for him. He testified that he often ventured out to visit the children, but stopped before he got to the home, because something was making it too difficult for him. The court infers that that thing was guilt.
The plaintiff has submitted a set of alternative orders, either, of which he asks as relief from the court. One would have the marital home be held in trust for the minor children.
The plaintiff testified that the prenuptial agreement was created by him and his attorney, and that the defendant through CT Page 7086 counsel asked that the agreement be amended to include alimony if the parties were married more than ten (10) years, and that the defendant was concerned that any of their children be provided for. He agreed in cross-examination that they had discussed having four children. He claimed that she would be taken care of by his provision of care for the children. He could not find in the prenuptial agreement any provision for the defendant herself. The plaintiff testified that the prenuptial agreement did not disclose his income stream from the calendar year 1990, but it did contain his W-2 for 1989.
On cross-examination, the plaintiff testified that he had had two fiancees prior to meeting the defendant, one of who lived in the marital home with him and his three children while he was dating the defendant. The defendant claimed that he was uninvolved with all of his children and that he continued this practice into his marriage and his relationship with Charity Folk, while his wife, the defendant, was home with the children.
When asked what portion of the day was available for the defendant to work outside the home to provide for herself in light of the plaintiff's reliance of the prenuptial agreement which has no provision for alimony, the plaintiff testified that her job with the children was a twenty-four hour per day job. He claimed that the transfer of the Massachusetts property should be construed as sufficient for her support. The plaintiff has proposed to purchase that interest for One Hundred, Twenty Thousand ($120,000.00) Dollars. Plaintiff further claims that the transfer to her in November of 1994 of the marital home was for business purposes and not a gift under the terms of the prenuptial agreement.
He claimed that when they were married, he did not insist that she care for his three adolescent children, and that she was not forced to do anything for them as their stepmother. He agreed that his oldest child was legally blind, and that the girls were 14 and 13. He testified that he was the primary responsible parent, even though he worked ten to eleven hours per day per week. He claimed that he knew the difficulties with the children prior to the marriage, especially with young Mike. He testified that the relationship between the defendant and the children during her first pregnancy was not good, but that he acted as a mediator. He claimed that he would spend time with them to try to work things out, and to appropriately discipline them if they needed it. During cross-examination, he testified that one of his daughters had disclosed a difficulty with a person who had been contracted to CT Page 7087 collect maple sugar at their farm in Massachusetts. That person had continued in that contract, despite that disclosure, although the plaintiff testified that he did believe the substance of the disclosures. That child was ultimately assisted by some inpatient therapy, and the plaintiff claimed that they put those issues behind them.
The plaintiff was asked why he blamed the family dysfunction on the defendant rather than placing some of the responsibility on his children's difficulties and their ages. The court finds that the plaintiff's claim concerning the relationship between the children and the defendant as a reason for the breakdown of this marriage to be exaggerated and not compelling. Not only was the condition temporary, but the parties had clearly decided to have more children, and proceeded to create three children. To leave a marriage for such a reason is not sustainable. His complains concerning her afternoon naps also did not impress the court as any valid reason to leave a marriage and three young children.
On cross-examination, the plaintiff was asked about his claim that she had left the marital bed to sleep closer to the baby, after the baby's bassinet was removed from the marital bedroom. The plaintiff felt her removal was for the care of the child, but then persisted because of the estrangement in their relationship. He testified that he felt she gave all of her love to the child, and that there was none left for him.
The plaintiff agreed that he spent very little time with the children just after their separation, and that to date, the baby who is eighteen months old, has yet to spend an overnight in his home. The pattern of visitation was scant until the defendant withdrew her objections to the presence of Charity Folk, who by that time was cohabiting with the plaintiff. None of this information was ever a matter of court record, because the parties never accessed the court for purposes of normalizing their parenting relationship with their minor children during the lengthy pendente lite period of this case.
The plaintiff currently resides in a condo owned by Ms. Folk, which condo was the residence of the plaintiff shortly after the parties to this action separated. Ms. Folk moved in while the plaintiff rented the condo from a corporate owner. Thereafter, the condo unit was sold to Ms. Folk, and the plaintiff pays her the $975.00 rent which had been the rent to the corporate owner. The landlord is Charity Folk d/b/a East Bay of Simsbury, Connecticut. CT Page 7088 He claims it is a business Ms. Folk had for many years. She clearly makes no contribution to the rent of her own home. The plaintiff's attempt to claim that this is some form of business deal is disingenuous. His support of Ms. Folk in this fashion is an unacceptable drain against family finances.
The plaintiff was questioned concerning his trips to Florida, including the initial trip with Charity Folk. He and Ms. Folk went to Florida again in March of 1996, and he claimed that she paid for the trip tickets and he paid for the auto rental of approximately Five Hundred ($500.00) Dollars, with company funds, as were the auto rental expenses for a March, 1997 trip.
The plaintiff was required by court order to pay all automobile expenses of the defendant, concerning which he was found in contempt on December 17, 1996, Levine, J. When asked why he would not meet the court-ordered expenses in light of the fact that the company paid all of the expenses, he responded that his brothers were worried about corporate liability because of the heated nature of the divorce proceedings. The brother's wives were not denied this nature of support.
The property in Heath contained equipment for maple sugaring, valued at Fifty-eight Thousand ($58,000.00) Dollars at the time of the marriage, which the plaintiff now values for approximately Fourteen Thousand ($14,000.00) Dollars. His company historically paid for the avocation, and he could not demonstrate that the property was anything more than a tax loss, which was beneficial to him as, described in the tax returns. He also continued to use that property as his own, and the court does not accept his claim that his transfer to the defendant was consideration for the prenuptial agreement.
He testified that there were several homes and lots sold by Girard Bros., a separate corporation, during the course of the marriage. He claimed there were no profits, and that it solely owns real estate. He claimed no distribution. Echo Properties, Inc. is another corporate entity which he claimed was also a limited partnership. That entity sold a property for Eighty-five Thousand ($85,000.00) Dollars a couple of months ago, and while he testified on direct that it was a dormant corporation, on cross-examination, he disclosed that it was holding those funds and that he had not received any distribution from that transaction. He owns twenty-five (25%) percent of that corporation. On redirect examination, he testified that there was no profit from this sale. CT Page 7089
With respect to the process of the case, and the expenditure of attorneys fees, the testimony is consistent with the file, that a complaint for dissolution of marriage, dated July 6, 1995, and made returnable July 25, 1995, was served on the defendant on July 6, 1995, approximately three weeks after the birth of their third child. The first agreement on pendente lite orders came late in the afternoon of August 16, 1995, and were routine. There were filed objections to interrogatories, and there was a motion for a protective order with respect to the corporate records. The objection with respect to insurance was interposed on the grounds that they were corporate records as key man insurance. The plaintiff also objected to the disclosure of credit card receipts. The plaintiff objected to the request for financial statements of the corporation, and all of the objections concerning disclosure were heard and decided, with scheduling orders, on September 19. 1995, Rubinow, J. The corporation's Motion to Intervene was withdrawn on September 19, 1995, after the parties agreed to sealing any information disclosed by the corporations.
A deposition was scheduled and three days before the plaintiff canceled. A Motion for Sanctions was filed. The plaintiff thereafter filed a Motion for Control of Children's Assets, and the plaintiff could not explain why that was done, claiming he does not recall or that his attorney filed the motion. In his claims for relief he asks for the same control over the UGMA assets from his father's gift to them as he did in 1995. He thinks that the funds could be used to "dispose of this matter." He testified that it is an available asset, which could be replaced later, and which could satisfy "someone" here. Defendant claims that the plaintiff seeks to continue to control all of the assets of the family. While the court cannot find that those funds would be appropriate for the resolution of this case, there are reasons to allow the plaintiff to manage these assets which belong to the children.
In January of 1996, the plaintiff filed a motion to refer the matter of custody to family services. The filing of that motion was shortly after a schedule had finally been arranged, and after months of sporadic time between the children and their father. The plaintiff denied that it was an "attack", but rather apart of the process." He admitted that he threatened the defendant with a custody action.
The defendant filed a motion for expert witness fees in February of 1996. Until that time, no pleading addressed the CT Page 7090 existence of a prenuptial agreement. The pendente lite orders, entered on August 16, 1995, did refer to the prenuptial agreement. The plaintiff did not recall any further reference to that agreement. In March the plaintiff filed a Motion to Amend the Complaint to allege in count two that the transfer of the property used as the marital home was a resulting trust and should be conveyed by the court to him. He agreed that the transfer of property was such as defined in the prenuptial agreement, which agreement, the defendant claims, does not provide for a return of any property transferred.
He testified that to protect the children, only he could adequately care for the assets of the marriage. He testified that she could remarry, be under the persuasion of her new marriage, especially if that marriage contained children. Essentially, he expressed worry over a repeat performance of his first divorce, where he lost a house, and shortly after the divorce, his ex-wife left the children with him.
During the proceedings, the plaintiff filed a Motion for Attorneys Fees based upon the filing by defendant of a Motion for Contempt. When asked where she might get those attorneys fees, he agreed that maybe from her allowance and that he never gave it much thought. He did however, deny that it was an attack. He was again found in contempt, over the issue of non-payment and disconnection of the defendant's car phone.
He was aware that the defendant wanted to appraise the Heath property, but on December 4, 1997, the defendant filed a Motion for Extension of Time to produce her appraisals for the real property. The plaintiff again objected. The appraiser was never allowed into the Heath property. Plaintiff claimed it was never asked for. The plaintiff did not disclose his witnesses as ordered by the court. He agreed that he threatened to have her ordered to submit the drug testing, and the file reflects that the plaintiff resisted defendant's request that the deposition be limited with respect to those issues. On December 17, 1996, the court, Levine, J., ordered that the plaintiff could not offer physical evidence prior bad acts. The defendant claims that this shows a pattern of intimidation and control which unduly protracted these proceedings and for which there should be an allowance to defend. The plaintiff agreed that he had had members of her divorce support group deposed, along with members of her church. He did not prove his assertion that she had said bad things about him and his businesses, as claimed. He was forced to concede in cross-examination CT Page 7091 that he knew of nor could he discover any bad comments she had ever made about him or his businesses.
On cross-examination, the plaintiff was asked if he had accused the defendant of committing adultery during the marriage. He denied that, but was suspicious of her. He agreed he had no evidence of that. He also testified that he suspected that she continued to abuse substances. He had no evidence of that, but for a claim that she engaged in some loud behavior. He had no evidence of that, based on his claim that "he did not pursue it." He further told her he questioned whether or not Andrew, their third child, was his child. He denied doing this to her to intimidate her, but again had no evidence, and could not remember who told him that "rumor." It is clear that the plaintiff engaged in a pattern of bad faith dealing with his spouse during these proceedings.
When asked what he did to contribute to the breakdown of the marriage, he paused, and stated that he was selfish and a perfectionist. He cried when he stated that he could have pursued counseling more, and that he could have tried a little harder. He also described his lack of receptivity to her concerns. During arguments he admitted to being stubborn, and that that impacted the counseling sessions as well. Their screaming hampered resolution. He also felt that he could have addressed their lack of intimacy differently. When he left, he was sure that it was over, and that they were mismatched, and had made a mistake. He felt that if she had disagreed, she would not have let him go. When questioned about his infidelity, he denied that until he left the home. He refused to acknowledge that his attempts at reconciliation happened during times when he had broken up with Charity Folk. He claimed that he called that relationship off to attempt to focus on the marriage.
On redirect, he testified that the consideration for the defendant personally to enter into the marriage was the conveyance of the Massachusetts property. He claimed that his complete financial disclosure was made as attachments to the prenuptial agreement pursuant to law.
The plaintiff's deposits into his Fleet checking account and a summary thereof for the years 1995, 1996, and 1997 were made exhibits. The amounts going through the checking account do not square with the weekly income disclosed on his financial affidavits of like period. While other transactions may have been channeled through the account, it is clear that he had additional sums at his CT Page 7092 disposal and that he had significant control over the business operations. Moreover, there is no lack of assets or cash to support this family. His own reconciliation of his Fleet checking account deposits for 1995, 1996 and 1997 is plaintiff's exhibit 15 and demonstrates what deposits came from income and from other sources.
On redirect, the plaintiff testified that he did deposit the proceeds of loans so that he could sustain this litigation along with the support requirements of his family. There appear to be more than income from employment and investments into the account, but is clear that he is able to borrow and pay back. Many of the tax pass throughs were reinvested into the company, although some monies were retained.
His proposed orders place him, he claims, in a Three Hundred ($300.00) Dollars per week deficit. He testified that he would use tax refunds, vacation pay in lieu of vacation, and other borrowing to make up for that deficit. His testimony reveals that he already does that. He claimed in recross that he expected no tax refund this year. He also was examined with respect to what he was proposing to provide for his wife and children. The argumentative profer was dissected. The plaintiff continued to claim that he was in a precarious business position and that the funds available to support his family were limited as described in the exhibit. He wants the house back for his retirement, and conceded in recross that the prenuptial does not mention retirement.
Girard Bros. owns a property at Hoskins Road currently, and did own a portion at the time of the prenuptial agreement. Properties are still owned by Girard Bros. and remain an asset. He wants to use net values, rather than the values placed on the properties during the drafting of the prenuptial. Echo Properties sold its one piece of property. He conveyed his interest in the Roe, Massachusetts, property to his brother. He testified that he currently has no need or concern about hiding assets from creditors.
The plaintiff called Robert Lufkin, a CPA, who handles both business and personal accounts for the plaintiff. The corporation which is plaintiff's primary source of income, Simscroft-Echo Farms, Inc., is an S corporation, so that all tax liability is passed through to the plaintiff and his business partners. He testified that the corporation's cash flow was a problem. For the past several years, the corporation has suffered along with the New CT Page 7093 England region construction industry. On cross-examination, he conceded that the high gross sales numbers do not directly relate to the net profit, and cost reductions. He agreed that the plaintiff was primarily responsible for marketing the company.
The defendant began her case, by her own testimony. She left high school in the eleventh grade. She is a twin, and her sister accompanied her to all of the court proceedings. She worked for his company for a short time, and then met him during an AA meeting in August 1989. They greeted each other, and "that was it." She had been in treatment for alcohol and cocaine. She has been sober since June 25, 1989. Despite being left pregnant with two small children, she has not had a break in her sobriety. She denied any intimate partners other than her husband since the date of the marriage.
They started to date in the fall of 1989. They went out to lunch, but she insisted that they not date further while he was engaged to Nancy Grace. He promptly dealt with that situation, and became free to see her. She testified that they were engaged on October 5, 1990, and the prenuptial was given to her after that date. She did not remember the specifics of the negotiations, but she was told not to sign the agreement. She was in love with him, because he was always there. He made her feel "safe and warm, he was such a good man." They had lived in the same town all of their lives, they wanted kids, he was stable and easy to fall in love with.
At the beginning of their courtship, his children played no role. After Nancy Grace moved out, the children were with them, off and on, until the marriage, when she moved into their home.
The defendant worked at the time of the marriage, and for the first three months or so thereafter. She claimed that she gave most of her paycheck to the plaintiff. She stopped working midway through the first pregnancy.
She agreed that it was difficult to manage the adolescent children of the plaintiff. She agreed that she marked the coke, because she would buy it and it would be gone. She was pregnant and sometimes craved sweets. She testified that she understood that he wanted the house to be clean and organized, so she often played upstairs with the children so that they would not mess the family room. After their first child was born, she felt like a new, young unsure mother. Ethan was born by C-section, slept in CT Page 7094 their room, and then moved upstairs. She testified that the baby had chronic ear infections, and she was up and down all night. She asked to sleep in one weekend morning, and he refused. The baby was an early riser, and she always got up with him. She agreed that she always took naps, that it was a family custom for her family, but was completely foreign to him. She testified that he resented it.
The defendant first met Charity Folk when Ethan was nine months old. The plaintiff and Ms. Folk was very active in the Chamber of Commerce and town meetings. Defendant heard her name mentioned many nights at the dinner table, and found her birthday noted in his appointment book.
The defendant would deal with conflict in the home with her husband by taking short drives to calm down. She testified that she once went to Heath. They did not socialize frequently, and apart from the business activities he engaged in outside the home, there was not much demand that she entertain.
She denied that she compared him unfavorably with an old boyfriend. On the day that he left, he had come home from church, went into the bathroom, and she asked him where he was going. He said none of your business, and she asked him why, and he wondered why he would stay with a bitch like her. She said if you're going to leave, then come later and get your things. He did. She had no idea that he would leave and never come back. His time with the children was very limited, and she expressed grave concern about that.
He denied that he had been with Charity Folk in Florida, and he threatened that Charity would sue her for libel. She testified that Charity Folk broke up her marriage, and has a large part to play in the breakup of their family, and keeping him away from his children. She agreed that she spoke to Charity Folk, to ask her to stay away from her husband. She was then six months pregnant with their youngest child. The parties spoke often about whether or not he would be present when their last child was born. On the morning of the birth, he called to ask her what to wear. He drove her to the hospital. It was strained, including the ride to the hospital. They engaged in small talk. She asked him to leave while she undressed to be prepped for surgery. He was incensed at her request. When she saw him again he was glaring at her. She cried when she recounted that he said, "you miserable bitch, you ruined my life. " CT Page 7095
On the 4th of July weekend, just after the birth, a problem developed. The plaintiff had gone up to Heath. Andrew was three weeks old, and he started gagging, with foam at his mouth. The doctor came to the house because she was alone with the children. The pediatrician thought that the baby had a whole in his heart, or a heart murmur and wanted to do other tests. The plaintiff had asked her not to call him, so she had to beep him. He yelled her for harassing him, and said the baby was probably ok, "why are you bothering me, and was it too much to ask for a perfect baby." He expressed no concern for the child, but rather was concerned about how she ruined his weekend. The baby was taken to a pediatric cariologist for one visit. The diagnosed problem did resolve itself.
The defendant agreed that she had stayed upstairs close to their first child, who suffered from chronic ear infections, and needed alot of attention. She moved the baby upstairs when she recovered from the C-section, and agreed that it was not normal but when they discussed it, it was agreed. She also considered it her "job" and that her need to be available to the children was not something that they fought about during the marriage. She testified that she would always go to him when he requested, and that she was sometimes criticized if she went to him when he did not ask.
She complained that he was not an attentive father, and often said he would not be available on her schedule. He did not see the children for quite a while upon their separation, and has been unresponsive to the needs of the three young children. Her testimony concerning the emergency with Alex was a glaring example. She relies heavily upon her extended family in Simsbury, and would like to have a smaller home in Simsbury to raise this family.
She has only been able to pay the retainer for counsel, and one other payment of One Thousand, Six Hundred ($1,600.00) Dollars. She borrowed money from her sister for the costs of a deposition. She has no funds to defend this action. She requests an allowance to defend. She claimed that everytime she did not agree to his settlement offers, he would threaten her, and even made a motion for custody of the children. In the fall of 1996, she met him at a school parking lot, where they talked. She testified that he gave her a ten-day ultimatum, or he would drag her through the mud, and find the toughest lawyer he could find, and that if she did not make a settlement, she would be sorry. She was panicked. She is CT Page 7096 clearly intimidated by his intelligence, business acumen, and his wealth. She is not a match for him, although she has persisted in this process through trial. She claimed that he threatened to expose her past, that she was a lesbian, and that he would bring in her friends to testify. On cross-examination, she claimed that he gave her this ultimatum, although he had presented multiple settlement agreements to her, but she refused to characterize this conversation as anything other than a threat. She claimed that her fear of him was based on how powerful he was, how he intimidated and harassed her, as he had his older children. She claimed he projected what he was doing onto her, and created problems because of that. He certainly projected infidelity with her old boyfriend on her based upon his conduct with Charity Folk.
She claimed that he also threatened that Charity Folk would sue her for any libelous statements. She was blamed for their flagrant goings on about town, and they attributed "rumors" to her. The defendant testified that she had not really had any vacations since the separation, except a weekend at Bromley, and Point Judith, Rhode Island. She testified that she has not used the Heath, Massachusetts property since the date of the separation, despite the fact that the plaintiff claims that the property belongs to the defendant, and was consideration for the prenuptial agreement.
She denied any infidelity, or break in her sobriety. When asked what she contributed to the breakdown of the marriage; she admitted that she neglected the status of the marriage in favor of their babies. She put a priority on motherhood. She admitted that her relationship with his adolescent children was not very good.
On cross-examination, the defendant denied that she had had unresolved "romantic feelings" for an old boyfriend, and that that came up during their argument just prior to their separation. It is clear from the testimony that the name of an old boyfriend came up because of the plaintiff's involvement with Charity Folk.
She testified that she had representation for the prenuptial agreement and that it did not matter what was recommended to her about signing it because she was in love with the plaintiff and would have signed it regardless of what it said.
She testified that the plaintiff told her many times that she had ruined his life. She had no recollection of his having related that to his claim that she had taken the children from him. She CT Page 7097 kept a diary after he left the house because she was encouraged during treatment to release bad feelings. She did not keep that diary for any period, nor could she say that she put in the diary her dinner with her old boyfriend. She was too busy with the children, and too upset to write it down.
On cross-examination, she agreed that she had a compensation agreement with her attorney which was result oriented and that her attorneys fees could be limited to just over Thirty-three Thousand ($33,000.00) Dollars. Her financial affidavit discloses expenses for the marital home, which are paid for by the plaintiff.
On redirect, she testified that she was never asked for the return of the marital home after the transfer, and that she was never told that she would one day have to give it back. She agreed that there were no creditors who claimed anything against the plaintiff and who might have looked for that property to pay any of his debts.
She claimed that she would like to be free of the plaintiff's control. She feels completely dependent on the plaintiff except for the clothes the children wear and the food she chooses to buy at the supermarket. Whenever she needs a car repair, she is given grudging assistance. She does not want to go to the Girard businesses for everything that she needs.
She recalled a Valentine's Day conversation when he told her he was too old to be doing this, having babies, but rather that he should be out on the golf course and going to the opera. She recalled it because he had never been a golfer and they had never gone to the opera.
The defendant called Charity Folk, the other woman. She looks uncannily like an older and more sophisticated version of the defendant. She left her husband in February of 1995, and moved from their home on March 1, 1995. She rented a condo and paid approximately Nine Hundred, Thirty-five ($935.00) Dollars per month as rent. She resided with a friend after that lease expired until August of 1996, when she moved in with the plaintiff. She purchased the condo in which he had been living. She paid her personal expenses. They have a two-bedroom condo, and she testified that they each keep their personal belongings in separate bedrooms, although they share the same bed.
The witness testified that in February of 1995, she and CT Page 7098 plaintiff had lunch three times, and then left their spouses and began their affair within the same month.
The witness never used the word "sue" in a conversation with the plaintiff, but did say she would take "legal action," in light of the defendant's alleged suggestion that the witness may have a sexually transmitted disease which the defendant may have contracted and passed on to her six month old fetus. She agreed that she had the plaintiff pass along a message that it was inappropriate for her to say those kinds of things about her.
The defendant called R. Cornelius Danaher, the attorney who represented her with respect to the prenuptial agreement. Defendant's twin sister, Patty, has been his paralegal for approximately fourteen (14) years. He advised defendant against this agreement, and testified that he had attempted to negotiate certain major terms in the agreement, but was immediately rebuffed. There were no substantial changes to the agreement, and he felt that the agreement was not in his client's best interests. Mr. Danaher wrote the defendant a letter advising against signing the agreement (Pl. Exh. 37), and advised her again not to sign when she asked him to take her acknowledgement. He refused even to take her acknowledgement, feeling that she was not competent at that time to make that decision. He testified that he had never before that date, nor since in his practice of law, ever refused to take someone's acknowledgement. At that time, she had decided to marry the plaintiff without regard to the long-term financial ramifications to her based upon this agreement. The agreement was signed by both parties before the same notary in Simsbury. It appears that the plaintiff's attorney was not involved in the signing of the agreement either. On redirect, he testified that the acknowledgement did not recite that it was the signator's free act and deed. Furthermore, he felt that she was "starstruck", and was going to do anything he asked her to do or told her to do.
On cross-examination, he agreed that he had reviewed financial information of the plaintiff, as well as balance sheets. He could not recall that it was his idea that the agreement contained a provision for alimony if the parties were married for over ten (10) years. He testified that he had not done family law work for some time prior to this, and that he had done this as a favor to Patty. He had an associate in the office do some research for him, and that he reviewed the document.
On cross-examination, he was asked what in the agreement he CT Page 7099 considered not to be in her best interest. He reviewed it on the witness stand and opined that he noticed that there was no alimony until the marriage survived for ten years, and the provision for the children lacked specificity, despite a net worth claimed by the plaintiff to be $5.7 million dollars. While the agreement provided for a transfer of some property to her in consideration of the marriage, there were other provisions that he had asked for. He could not recall the specifics of the changes he had requested.
The plaintiff called Michael Folk, Charity Folk's ex-husband. He indicated that he developed a friendship with the defendant during the times that their respective spouses had coupled. He testified that the defendant was angry and wanted to get her husband, and wanted as much money as she could from him. They had one lunch and five or six phone calls. He recalled that the defendant was pregnant at the time of their lunch. She described the contact between the plaintiff and his then wife, and was upset, and indicated that she was still in love with her husband, and asked the witness to help her recover her husband and marriage from his wife.
The defendant called Patricia Hauser, her twin sister. They are identical twins. She is married and has three children. Her youngest child and Andrew are six weeks apart. Prior to the separation, the sisters talked often on the phone, and they saw each other on occasion. After the separation, their relationship became much more intense. She recalled her sister being very upset after a Valentine's Day dinner with her husband at the Chart House. The defendant had been told that the marriage was over. She saw her on weekends after the plaintiff left. The defendant was devastated, and difficulty understanding what had happened to her. She appeared to be in a fog, and was functioning for the children, but only as a robot. She had a hard time relaxing, and could hardly sleep.
Her sister said the defendant also lost her appetite, and it was during her third trimester, and she was not gaining weight. She expressed concern about how this stress was affecting the pregnancy. She was concerned for Ethan because of the abrupt nature of his father's departure. The defendant was physically exhausted and emotionally drained. The witness talked to the plaintiff when he came back from Florida, and had called the defendant to say that he was not coming back. He called her a miserable bitch, that she had ruined his life, and claimed that she was falsely accusing him of being in Florida with another woman. CT Page 7100
At that time, she believed him. He told her it was too painful for him when she pointed to the photographs of the children on his credenza.
At the end of 1995 or early 1996, an issue of his claim of custody arose. The witness claimed that she called the plaintiff to see if the process could be accelerated because of her sister's wellbeing. He said he would not settle the case if he had to provide financial disclosure. Their second conversation was heated, and was essentially the same. She recalled being in the car when the plaintiff called the defendant to meet him at a parking lot to discuss the divorce. She recommended to the defendant that she not meet him, but Mary did. When she came into her parents' home, she was observed to be physically shaking. She was scared of the future and what might happen to her. The witness called the plaintiff in his car and told him never to "f — king threaten my sister again." He simply hung up the phone. She said in her testimony that she feels the same way now.
She visited her sister and found her lying in a ball crying. She testified that the defendant had the support of her family, other than a baby nurse for the first two weeks after Andrew's birth. She relied on her sister, even though the family had other problems that they were facing. The witness was aware that the plaintiff offered little by way of assistance to the defendant.
The plaintiff claims in final argument that the prenuptial agreement is valid and binding. The court has allowed time for the filing of a brief on that issue. The plaintiff argues that both parties came into the marriage with some baggage, and that it was doomed from the beginning. The plaintiff claims that the lapse of intimacy by the defendant's move from the marital bed was a predictor of failure. The plaintiff claims that there was more, and that is the presence of Michael DeGrey as a reason why she could not commit to this marriage.
The plaintiff claims the transfer of the marital home to the defendant was not a gift pursuant to the prenuptial agreement, but rather for creditor protection. Plaintiff claims that he is more credible, in that in Pl. Exh. 3 (Def. Exh. 16), a loan application in 1994 for a refinance for Great Pond Road, he did not puff up his income. The plaintiff claims his income is $112,000.00. Def. Exh. 7 are financial affidavits filed in this action. In 1995 his net income is $1,200.00 and he discloses higher income as he went CT Page 7101 through the divorcing process.
The plaintiff cites that the standards of equitable distribution would militate against any further monies to be paid to the defendant, even if there were no prenuptial agreement. The plaintiff's claim is that the prenuptial agreement is beneficial to her. The plaintiff counters Mr. Danaher's testimony that this was not beneficial to her must fail.
The plaintiff contends that there is no bill for attorneys' fees which make a record for payment of fair and reasonable fees, or any indication of the hourly charge, or how much may have already been paid. The plaintiff contends that he has no liquid funds with which to pay attorneys' fees.
The defendant claims that she and the three children were abandoned so that plaintiff could pursue his relationship with Ms. Folk. After planning and producing a family with the defendant, the plaintiff decided that he did not want to live the lifestyle of a father again. The defendant claims that there is evidence concerning the claim for attorney's fees; the defendant testified that the hourly rate is $250.00, and that the claim was Fifty-one Thousand ($51,000.00) Dollars.
The court finds that the prenuptial agreement is unenforceable in this action. The court finds that the defendant did not make an informed decision to enter into the contract, and that the current circumstances of the parties were not contemplated at the time the contract was entered into. The enforcement of this agreement would work injustice on the defendant and the children. McHugh v. McHugh, 181 Conn. 482 (1980). The prenuptial, which eliminates an award of alimony for an undereducated, unskilled mother of three preschool children is unconscionable. The plaintiff, by his own testimony, agreed that his wife was unemployable outside the home, and that taking care of their three small children was a "24 hour job." The claim that consideration of the agreement was the Heath, Massachusetts property underscores the court's finding of unconscionability. At all times before and during the marriage, the plaintiff exercised full dominion and control over that property, and the income stream, which flowed therefrom. The "gift" to the defendant was in name only.
The plaintiff's reliance on this court's opinion in a 1992 case, Adler v. Adler, Superior Court, Judicial District of Litchfield, December 4, 1990 (1990 CaseBase 4703, ___CSCR ___), is CT Page 7102 misplaced. The facts are entirely distinguishable. The age and stations of the parties are vastly different, and most importantly, the parties had no preschool, minor children. In fact, they had no children, issue of that marriage. They both were educated and had assets going into the marriage. In the case at bar, the disparity of education, age, employability and assets is enormous. At the time of the trial, the defendant was almost exclusively the caregiver of the small children of the parties, and received very little in the way of respite care by the plaintiff.
The defendant argues that the prenuptial agreement need not be invalidated in toto by this court. In light of the findings made, the court disagrees. The court finds that this case must be decided along equitable lines, as articulated in the statutes, C.G.S. Sec. 46b-81 et seq. Therefore the court makes the following orders with respect to parenting of the children, financial claims, and family support claims.
1) PARENTING TIME: The parties shall continue to parent their children jointly. The children will live in their mother's home, and she shall be responsible for their care except when they reside with their father and are cared for by him. The children will be with their father every Tuesday and Friday, from 5:30 p. m. until 7:30 p. m., every third weekend from Friday evening at 5:30 p. m. until Sunday at 4:30 p. m. Should the father not visit during those specific times, he shall be responsible for all childcare costs during that period, which cost shall be in addition to the order of child support. The father should be encouraged to spend more time with his children, and these orders are intended to be minimum access orders. The parties shall share holidays, except that the children shall wake up in their mother's home for Christmas and Easter.
The father shall have the children for vacations for no less that two weeks during the year. If he elects not to exercise said access, he shall be responsible for all cost of childcare for those periods, which cost shall be in addition to any order of child support. The plaintiff shall inform the defendant at least one month in advance as to his plans for such vacation time.
The children shall be with their father on Father's Day, and with their mother on Mother's Day. Each parent shall have access to their children on the children's birthdays. The children shall spend their parents' birthdays with the respective parent. They shall be allowed to participate in special occasions or events with CT Page 7103 their extended families upon reasonable notice, permission for which shall not be unreasonably withheld.
The children shall not be removed from the State of Connecticut without the written agreement of the parties or order of the court. If the children are to go to the Heath, Massachusetts, property for the weekend, the requirement of writing is not necessary, but the plaintiff must tell the defendant where the children will be spending the weekend. They shall share the itinerary, phone number and address where the children will be staying and with whom, prior to their traveling outside the State of Connecticut.
Considering the financial position of the plaintiff, his request for such limited time with his youngest children is quite regrettable. The court can only hope that he rededicate his life to his children, and reprioritize his life to deal responsibly with their need to spend time with him, and to fully participate in his life, and learn from him. The defendant was clear in her position t that she wanted the plaintiff to spend more time with the children. Perhaps as they age, he will assume a more committed and constant role in parenting.
2) CHILD SUPPORT: The plaintiff shall pay the sum of Seven Hundred, Fifty ($750.00) Dollars per week as child support. The court finds that the income of the plaintiff exceeds the Child Support Guidelines. The court finds, pursuant to C.G.S. Sec. 46b-215a, that the application of the guidelines would be inequitable and inappropriate to the circumstances of the parties. The court has articulated above the findings with respect to his claimed income, the evidence of his spending, and the evidence of availability of funds to pay certain expenses. He does not ask Ms. Folk to contribute to their household, despite the fact that he engineered her purchase of his condominium. While he owns no interest in that real property, he bears all of the cost of housing, which allows additional income to Ms. Folk, and by implication, into their family unit.
The plaintiff shall maintain for the benefit of the minor children the current health insurance, or its equivalent, so that their treating physicians remain the same. The plaintiff shall pay seventy-five (75%) percent of the unreimbursed health-related expenses for the minor children, and the defendant shall pay twenty-five (25%) percent. The provisions of C.G.S. Sec. 46b-84(d) shall apply. CT Page 7104
The plaintiff shall contribute one-half of any extraordinary educational or recreational activities of the children about which the parents may agree.
3) ALIMONY: The plaintiff shall pay to the defendant wife the sum of Four Hundred ($400.00) Dollars per week as alimony. That payment of periodic alimony shall terminate upon the death of either party, remarriage of the defendant, or cohabitation within the terms of the statute. It is specifically ordered that the modification of alimony due to future cohabitation be guided by C.G.S. Sec. 46b-86(b). Periodic alimony shall be payable until the youngest minor child has completed her secondary education, and may be modifiable as to amount during that period.
The award of alimony shall be secured by an encumbrance on his business holdings, which encumbrance shall be secondary only to encumbrances of record prior to the start of trial, or by life insurance owned by the defendant but paid by the plaintiff. Proof of encumbrance shall be available upon request of the defendant yearly on the anniversary of judgment.
The plaintiff shall continue to cover the defendant on medical benefits for the period permitted under COBRA at his sole cost and expense. The defendant shall be responsible for her unreimbursed medical expenses.
4) REAL PROPERTY: The parties own real estate in Simsbury, and in Heath, Massachusetts. The court has previously found that the Prenuptial Agreement is invalid. The parties have an equitable claim to the properties. The plaintiff owned the Heath property before the marriage, and he has persisted in exercising dominion and control over that property during the separation of the parties. The defendant shall convey all of her interest in and to the Heath, Massachusetts property to the plaintiff, with all improvements thereon.
The defendant shall retain all of her right, title, and interest in and to the property at 59 Great Pond Road, Simsbury, and the plaintiff shall pay the mortgage on such real estate, including property taxes. The defendant shall be responsible for the payment of all other costs of maintaining the home. The plaintiff's company has historically paid the mortgage, and he continued to provide this home for his family after his decision to leave the marriage and his young children. Insofar as the court CT Page 7105 has found that his actions in selecting a new romance over his obligations to his wife and children was the cause of the breakdown of this marriage, the family unit he left should not be expected to compromise on the life he provided to them. He persisted in creating a family with the defendant, knowing how dependent she was on him, and then left her.
The plaintiff shall cooperate with the defendant if she elects to sell the Great Pond Road property. He may pay off the mortgage or co-sign, with her, a mortgage on another property at the outstanding balance due on this mortgage, and continue the payments of the new mortgage.
The payment of the mortgage shall not be income to the defendant, but shall be additional support for the children. As such, it is not a dischargeable debt, but the plaintiff shall have the income tax deduction for mortgage interest and real estate taxes. If he is current with all child support obligations, he shall also take the children as dependents for income tax purposes. His obligation to pay this mortgage will terminate upon the completion of secondary education for their youngest child. Insofar as the defendant has been required to keep home and hearth for the children, it will not be terminated for any other reason.
5) LIFE INSURANCE: The plaintiff shall, as offered, maintain life insurance in the amount of One Hundred Thousand ($100,000.00) Dollars for the benefit of the minor children for the period of his obligation to pay child support. He shall name the defendant beneficiary thereof. The plaintiff seeks an order that the defendant secure a life insurance policy. The court does not recall testimony concerning her insurability and will not make such an order.
6) TAX RETURN: The parties shall file the 1997 Income Tax Return jointly, at the option of the plaintiff, who shall retain any refund, but who shall be responsible for the preparation, payment of taxes, and any interest or penalties thereon, and hold the defendant harmless and defend any action as a result of such filing.
7) STOCK: The plaintiff shall own the Village Water Company stock, and retain one half of the Simsbury Bank stock. The defendant shall retain one half of the Simsbury Bank stock. The assets in the name of the children shall remain their property, but may be managed by the plaintiff. No reduction shall be allowed to CT Page 7106 occur in the value of those assets, and the children shall be entitled to the appreciated value of those assets should the plaintiff elect to use their funds. Any funds so used shall create a claim against the estate of the plaintiff.
8) PERSONAL PROPERTY: The parties shall retain their automobiles, and the defendant shall retain the property in the Great Pond Road property. Except as specifically ordered herein, each party shall retain the assets listed on their respective financial affidavits.
9) HOLD HARMLESS: Plaintiff shall indemnify and hold the defendant harmless from any claim of Charity Folk, or members of the Girard family or its corporate entities against the defendant. The court does not find credible the evidence offered by the plaintiff that the defendant had engaged in any behavior, which damaged the plaintiff, Ms. Folk or the businesses. Rather, the court finds that the assertion of such a claim was a threat against the defendant, and an attempt to manipulate her.
10) BUSINESS ASSERTS: The plaintiff shall retain all his right, title, and interest in any stock, bonds, interest in his businesses, his pension and profit participation plan, or other retirement assets.
11) COUNSEL FEES: the plaintiff shall pay the defendant as an allowance to defend, Thirty-three Thousand ($33,000.00) Dollars as an allowance to defend this action. The court finds that the plaintiff's unwillingness to accept responsibility for his actions in the breakdown of this marriage, and the trial tactics attempted, prolonged this litigation, and necessitated the expenditures of these reasonable sums for counsel fees. Those fees may be paid in installments, but must be paid in full in eighteen (18) months.
12) YOUNTEF ORDERS: The orders of this court shall be effective during any period of appeal. If the plaintiff elects to appeal, he shall pay Ten Thousand (10,000.00) Dollars as counsel fees for an appeal within fourteen (14) days of filing an appeal.
Judgement shall enter consistent with this opinion.
DRANGINIS, J.